Green, J.,
delivered the opinion of the court.
The complainants Zilla and Sally, are the children of the defendant, by his former wife Tamsey. Tamsey was the daughter of John Dodd of Louisiana, who died in that State, possessed of considerable estate, about the 1 st of December, 1815. Mrs. Smith and her husband, the defendant, lived in Tennessee, where she died in February, 1816, before any measures were taken to obtain her share of her fathers estate. Her only children surviving her were, the complainant, Zilla, wife of McCollum, and Sally, wife of Reid, and William Salsbury, a son by a former husband. William Salsbury died in November, 1826, without lawful issue; leaving his sisters, Zilla and Sally, his only heirs and distributees.
The defendant, Smith, obtained his wife’s portion of her father’s estate in Louisiana, and was guardian of William Salsbury, whose estate went into his hands. This bill is brought by his daughters and their husbands for an account of each of these funds.
The principal question in this cause is, whether negroes are to be regarded in Louisiana as real estate, or personal? .For it is not disputed on either side, but that if personal, the law of Mrs. Smith’s domicile will govern; and if real, the law of the place where it was situated will control the succession. Story’s Confl. L. § 481, 483.
By the law of Louisiana, real estate and immovable things are convertible terms. Dig. 1808, B. 2, c. 2, Art. 13.— And that law, Art. 19, contains the following provision, inr elation to slaves — “Slaves in this territory are considered immovable by the operation of law, on account of their value and utility for the cultivation of the lands, and therefore they may be mortgaged.”
The chapter from which this extract is made, treats only of immovable things, enumerating what are such and in what sense; whether by their nature,' or by operation, or destination of law; and commences with the words, “Real estate or immovable things are,” &c. Thereby substituting the terms, “immovable things,” for “real estate;” Story’s Confl. L. § 447, says, “that in addition to those things which may be deemed universally to partake of the nature of immovables, or, *353 as the common law phrase is, to savor of the realty, all other things though movable in their nature, which by the local law are deemed immovables, are, in like manner, governed by the local law. For every nation, having authority to prescribe rules for the disposition and arrangement of all property within its own territory, may impress upon it any character which it shall choose; and no other nation can impugn or vary that character.”
If these principles be correct, they settle the question; for Louisiana has said, by its law, that slaves are immovable, and having a right to impress upon them any character it may choose, which Tennessee has no right to impugn or vary, it follows that the law of Louisiana must govern the succession.
It is earnestly argued, that this language of Judge Story must be restricted in its meaning, to such things, movable in their nature, as are by law attached to the land,- and are thus made to savor of the realty. This is plainly a misconstruction of the author; for he says expressly, that in addition to the things that are universally considered to savOr of the realty, “all other things,-though movable in their nature, which by the local law are deemed immovables, áre .in like manner governed by the local law.” Thus plainly intending to assert the power of a nation to impress any description of property, with the character of “immovable;” whether connected with land or not.
But it is insisted, that no State has a right to do this; and thus give to property, movable in its nature, a destination, different from that, which by the law of nations would be given to it, were there no such local law.
If this argument be well founded, the power, by law, to attach movable property to the freehold, and thus constitute a part of it, would be equally beyond the competency ol a State. Is it not as easy to declare, in an act of assembly, that horses for the plough shall constitute part of the freehold, and thus make them immovable, — as to announce simply, that horses shall be immovable property? It is certainly difficult to perceive upon what principle, the competency to enact the former provision can be maintained, while the power to make *354 tlie latter is denied. And yet the power to attach, by faf#> things in their nature movable to the freehold, and thus make? them immovable, is not denied in the argument; — -and, indeed? could not be, for the common law, as well as the civil law? recognises some things movable in their nature, as part of the freehold. This right to impress upon movable things, the character of immovables does not depend upon their relation to the freehold, but results from the power inherent in every nation, “To prescribe rules for the disposition and arrangement of all property within its own territory." When this shall be done the law applicable to immovables governs the disposition which must be made of such property.
It is insisted that the law of Louisiana refered to was not made with a view to the succession, but that, as only immov-ables are there subject to mortgage, slaves on account of their' value, were impressed with the character of immovable with the view only of malting it lawful to mortgage them.
This is evidently a misconstruction of the law. It is true,, that after announcing that slaves are immovable property, it is added in the digest of 1808, “And therefore they may be mortgaged.” But this is stated as a mere consequence, or incident, resulting from the character with which the property had been impressed by law. The chapter is not treating of mortgages, or securities, but of the character of property,defining what things are immovable in contra-distinction to movable things. To put it beyond doubt, that such is thetrue construction of this article, it will be perceived by refference to the civil code of Louisiana of 1825, Book 2, Tit. Ch. 2, Art. 461, that the words, “And therefore they may be mortgaged,” are omitted altogether. The language of that article is, “Slaves, though movable by their nature, are considered as immovables by operation of law.
Thus we have a legislative construction of the article in question, removing all doubt.
These principles having been established, let us apply them to the case under consideration. We have seen that John Dodd died in Louisiana in 1815. His daughter Tamsey, wife of the defendant Smith, him surviving, then resided im Tennessee, where she died in 1816.
*355 In relation to immovable property, the descent and heirship is exclusively governed by the law of the country, within which it is actually situate. “No person can take except those who are recognised as legitimate heirs by the laws of that country; and they take in the proportions and order which these laws prescribe.” “This,” says Judge Story, “is the indisputable doctrine of the common law;” Confl. L. §483. By the law of Louisiana; Dig. Civ. Code., B. 3, Tit. 1, Ch. 2, § 2; Art. 27, p. 150; when a man dies all his legitimate children “participate to his succession by equal shares.”
John Dodd had five children, of whom Mrs. Smith was one, so that she became entitled to one-fifth of all her father’s estate.
This vested in her as paraphernal property; and as the law of Louisiana governs, as to the land and negroes, being immovables, that portion of the estate was held by her independently of her husband, of which she had the administration and enjoyment. Civil Code, La. 334. This property remained undisposed of, and undivided until after the death of Mrs. Smith in 1816. Upon her death by the law of Louisana, the succession to all her property in that State, is participated by her children. But as that law governs only as to the immovable, Story’s Confl. § 483, the defendant, her husband, as administrator of her estate in Tennessee, is entitled to her movable effects; and is not bound to account for them to her children. Story’s Confl. § 481.
But it is insisted, that as Smith and wife were married in Tennessee, that contract was made in reference to the law of Tennessee, and, therefore, all their matrimonial rights are to be governed by that law. . This question has called forth much ingenious discussion on both sides. It is unnecessary to add any thing of ours, other than to announce the result of our investigation of the subject. We think that, however, the domicile of the parties may be changed, the law of the actual domicile will govern as to movable property acquired after such change of residence, and as to all immovable property, the law of the place, where it is situated. Story’s Confl. L. § 187.
Upon these principles, the complainants are entitled to an *356 account for the estate of their mother, which may have come into the hands of the defendant.
Indeed, if these principles were less clear and satisfactory, than they appear to be, the manner in which the defendant has treated the subject, recognizing the rights of his children* in the proceedings in Louisiana, acting as their guardian in the division of their grandfather Dodd’s estate, and receiving their portion in that character, are circumstances which tend strongly to support their claim to the account they seek.
He could not have obtained the property in Louisiana in any other character than as guardian for his wife’s children; nor did he ever set up any right to it until this bill was filed. He told Mrs. Woodson, his step-daughter, that his daughters were worth more than she was. In requiring him to ac-> count for this estate, therefore, in accordance with our views of the rights of the parties, he will only do what he has all along felt himself bound to perform.
But the defendant insists in his answer, that he has settled with the parties entitled to this estate, and therefore he is not beund to account.
To support this allegation in the answer, he has produced a receipt from the complainant Sally, dated 29th September, 1833, wherein she acknowledges the receipt from him, as guardian, of two thousand dollars in money and property in full of all demands.
The evidence shows that this receipt was obtained from his daughter without consideration; no money having been actually paid. That his daughter was young, lived in his house, was very much under his control and influence, and most probably did not know what was the character of the paper she signed. There is no pretence for setting up this receipt in opposition to the account prayed for.
The defendant also relies upon a receipt from William Salsbury, dated October 21, 1S26, for two thousand and fifty dollars, in which a settlement is acknowledged to have been made with Smith as guardian, and that sum received.
It is insisted, that this receipt is valid, and ought to be conclusive as to Salsbury’s share of the estate; for that, although it may appear from the evidence, that Salsbury did *357 not receive this sum, still he was of age, gave the receipt voluntarily, and that he had a right to give his estate to Smith if he chose to do so.
This view of the subject presents'] some difficulty in the mind of the court, and had the defendant treated it in this manner, we should have hesitated before we would have pronounced it invalid. But the defendant in his answer, alleges that he had advanced money to Salsbury from time to time, and had permitted him to take possession of his property, and after he became of age, settled with him and took his receipt. He thus puts his defence upon the ground, that he had actually paid Salsbury his distributive share of both his fathers and mother’s estate.
But it satisfactorily appears from the evidence, that such was not the fact. At the time the receipt was executed, no money was paid, no note was given, no property was delivered; and Salsbury dying shortly afterwards, left no visible estate, save a horse or two, known to any of the witnesses. It is in proof too that Salsbury was not an extravagant young man.
It impossible, therefore, to believe that Smith actually paid the money mentioned in this receipt; and as he has placed the question of its validity upon an actual payment, and not as a gift from Salisbury, we cannot regard it as a gift, and being satisfied the money was not paid, we are of opinion it presents no obstacle to the account the complainants ask, of Salsbury’s estate in his hands.
L.et the decree be affirmed.